The next matter, No. 25-1334, Cleveland Bakers & Teamsters Health & Welfare Fund v. Amag Pharmaceuticals, Inc., et al. At this time, would counsel for the appellant please come to the podium and introduce himself on the record? Good morning, Your Honor. May it please the Court? Joseph Meltzer for the appellant, Cleveland Bakers & Teamsters Health & Welfare Fund. Your Honor, the district court held in its opinion the complaint in essence alleges a scheme involving fraudulent drug labeling. In particular, a scheme based on allegedly fraudulent representation in the label. Could you bring the mic a little closer to your... Sure. Sorry, Your Honor. Based on the allegedly fraudulent representation in the label, that Meccano was effective for its approved use of reducing the risk of preterm birth. That's the opinion at 12-13. The opinion goes on. I'll read one more sentence. In substance, it alleges that Amag should have amended the label to state that it was not effective for that purpose. Respectfully, Your Honor, the district court erred in characterizing this as a fraudulent label case. It's not a fraudulent label case. This is a fraudulent marketing and a fraudulent promotion case. Even if... and that led the district court in somewhat of a cursory fashion down the road of impossibility preemption. It essentially held that because the label couldn't be changed, there was nothing that Amag could have done. And it couldn't have curved its marketing effort in any particular way as long as it was, quote-unquote, consistent with the label. That's in error, Your Honor. Frankly, even if the label couldn't have been changed, compliance with state law was not impossible. The label could have said what it said. Amag made the decision after the FDA rejected the change, and I'll get to the reasons why it rejected the change. They made the decision after it rejected the change to put this into a marketing overdrive. They kept statements on their website that they knew were, or we allege, that they knew were false. They added statements to their website at this time that they knew were false. They funded associations to attack the prolonged study that they were the sponsor of, the 10-year study that preceded, well, essentially that the drug was conditionally approved upon the results of this study. They went into attack mode on those studies and didn't disclose their involvement in doing so. Would your argument essentially swallow up the preemption defense, at least in this category? Because it seems to me in every case in which there's an issue as to whether CBE could be resolved upon, and it's determined it couldn't, and therefore there's preemption, you could say yes, but the manufacturer could have just stopped marketing the drug. I'm having trouble thinking of a case where standard analysis would suggest preemption applies, and yet this argument would say it doesn't because they could have withdrawn it from the market. Well, Your Honor, I'll answer that in two ways. First, the CBE process was available in this case. But you just presented an argument, and I understand you reserved your position. You just presented an argument assuming the CBA wasn't available. You're saying there would still be no preemption, and that's the argument I'm directing to. I realize you've reserved also arguing that the CBA was available, in which case it would moot the need to say what you just said for the first two minutes of your presentation. Sure, Your Honor. Well, Your Honor, if the CBE process was not available, then the question becomes whether these laws are so in conflict that it makes compliance with them impossible. And I don't believe that's the case here. It doesn't stop the defendants from marketing their drugs. It simply stops them from they shouldn't be entitled or permitted to market them not in compliance with state law. Well, let me give you an example. You have a case where there's a dispute as to whether or not the drug has a certain side effect that is harmful. Plaintiffs say it does have that side effect, but the FDA has said otherwise and approved a label that does not list it as a side effect. So normally there's a case out there that would say preemption applies. But as I understand your argument, you would say even in that case, well, the manufacturer could have just not marketed it anymore, and therefore there's no preemption. And I'm trying to think of how that doesn't just swallow up the whole line of cases that deal with CBEs being not available. Well, Your Honor, in this particular case, and I think if you're reading the Albrecht decision and what they say is if you're going to view the facts, it has to be a balanced inquiry. And in this particular case where the FDA ruled that the label change was not permitted, it did so because, and expressly said, because CDER is proposing to withdraw its approval. And so in this instance, unlike in some other instances where the drug may be continued to be marketed and sold, in this instance the FDA is saying the efficacy has not been established. Approval is not going to be. We are undertaking a withdrawal process of the drug, and therefore what's left at that point if the manufacturer can simply run right past that stop sign and continue to market simply because the way the sequencing worked out in this case, CDER was proposing to withdraw the approval of the medication. So I don't think it follows the typical course of a failure to warn or a design defect case or the case in Zofran, for instance, where particular studies weren't disclosed but were known to the FDA. This isn't that particular case. This is a case where a study was ultimately disclosed six months after the top-line results were received, and the FDA essentially said we can't, and that was a year after that, the FDA essentially said we can't change the label at this point because we're probably going to withdraw the approval of the medication. And so the inquiry, if you're going to do a balanced testing or a recitation of the facts, the inquiry is what happens at that point if a manufacturer is in possession of information that it has regarding efficacy of the drugs, it now sees in the complete response letter that the FDA is rejecting a label change because of the approval issues. Does preemption allow them? Does the FDA's, I don't want to say endorsement, but does the FDA's refusal to change the label at that point give them the green light and carte blanche to market the drug however they choose, notwithstanding information we say they have in their possession that shows that that marketing promotion was fraudulent? I apologize, Your Honor. For this argument to work, would the reliance have to be on non-label statements? Yes, Your Honor. So is there anything in the complaint pleading that there was reliance on a specific statement other than the label? Well, yes, Your Honor. I think the statements that we point to in the complaint. I know those are the statements that are, but are there anything in the complaint saying not just here's a statement that was made that would be misleading, but here's a statement on which we relied that led us to market, that led us to make the purchase? Your Honor, I want to answer. I'm not totally following. I think there is no first-party reliance. I don't think we need to establish first-party reliance because the statements were made to prescribers and providers and consumers or patients in this case. Those are the statements regarding the efficacy of the drug, and are there statements that weren't on the label? Well, are you claiming that in your complaint, are you claiming that as the plaintiff you relied on a misleading statement? We're claiming that the statements caused us, just like in Kaiser and in Selexa, where the third-party payers were held by Judge Lynch and Judge Kataya to be the primary and intended victim of this fraudulent marketing scheme. That's our position in this case. The statements were directed, as I stated, to doctors and their patients. They caused us to then place drugs on the formulary that's laid out in the complaint. Because those people asked you to have it? I'm sorry, Your Honor? Just tell me the causation chain. The defendants market the drugs. They market the drugs in a variety of ways. They market the drugs to providers. They market the drugs to patients. Providers then prescribe this medication. It's then either covered or it's not covered. The determination of whether it's covered, this is in paragraph 72, I think, and 74 of our complaint, are by virtue of our third-party administrators speaking with OptumRx, the PBM, it gets placed on a formulary. And therefore, once it gets placed on that formulary, coverage is provided for that drug. And payments are then made by our client, plaintiffs and third-party payers. And that decision to place it there is based on what? Do we know from the complaint? If they don't make this push to have it, now this is a drug that's the only indicated drug for neonatal gestation less than 37 weeks. If the defendants don't make a push to have this drug covered under a formulary by virtue of going out to market and having it prescribed and having patients request it, the same way you see pharmaceutical commercials on TV, if it's not covered by third-party payers like my client, then there is no scheme. They won't sell the drug. Providers will stop prescribing it. Patients will stop using it. So I don't think we're any differently situated than the payers in Kaiser and the payers in Celexa in terms of the causal chain. And in terms of where that places us on the chain and causation, I think we are closer in terms of the causal chain than a wholesaler who might bring this case where none of this conduct was directed at them. And I know this question was brought up in the Humana argument, whether a wholesaler could bring this claim, bring us to the indirect purchaser rule. And I apologize, Your Honor, I don't think I reserved my two minutes for rebuttal. If it's not too late, I would still let you do it. Okay, thank you. You know, the question was whether the wholesaler could bring this claim. And the truth is they probably could, but even if they're further up on the distribution chain, they're further down on the causal chain. We're relying on essentially secondhand statements because the statements, in fact, first party go to providers and patients. They're one step removed from us. They buy the drug only because we placed it on the formulary, only because providers or prescribers are prescribing it for their patients. So the reason in this case to not apply the indirect purchaser rule is because, and there's been a lot written, especially recently, because the bright line rule in this context doesn't make sense. It's not based on sensible principles. It's based on a bright line application of antitrust law where it does make sense to do that because antitrust law involves violations, I'll just finish this quickly, involves violations that were based on overcharge and affect all participants in the market equally. Thank you. Thank you. At this time, would counsel for appellees please introduce themselves on the record to begin? Good morning, Your Honors, and may it please the Court, Jessica Ellsworth for the appellees. All 43 counts that the appellant asserted here against the defendants are premised on it being unlawful for defendants to have marketed an FDA-approved drug for its FDA-approved use, consistent with its FDA-approved label, because of a post-approval study that resulted in different findings. Well, they're not saying it's just a study. As I understand the argument, they're saying the study showed it was ineffective and the FDA then told your client that the FDA was in the process of considering whether to withdraw approval. So, Your Honor – And so they're saying at that point maybe you couldn't change any label, but you didn't have to go out and start touting the drug as effective when you knew it wasn't effective and when the FDA itself has given that as the reason for not changing the label. So, Your Honor, there's a lot packed into that question. I'm going to try and unpack it kind of piece by piece. First of all, what FDA was going to do with this second study was a complicated matter of science and policy that FDA struggled with mightily. The vote to proceed with a withdrawal proceeding was a 9-7 vote from the committee that spent an entire day listening to testimony, trying to figure out if these two studies were really comparing apples and apples or apples and oranges. Was one a false positive? Was one a false negative? Or was there some difference in the study population? So it is tremendously simplifying the matter in an incorrect way to suggest that when this second study came out, FDA threw up its hands and said immediately this is an ineffective product. If you look at JA-286 to 288, this is FDA's response to a citizen petition that public citizen had filed asking for immediate withdrawal of the approval. And what FDA said was no. The drug approval would remain in effect. It would remain with active marketing status. And there was a procedure, there's a process, there are due process rights for an NDA holder that has to make its way through the system and FDA has to ultimately decide what to do. In Bartlett, the Supreme Court rejected the idea that a manufacturer could be forced to stop selling its drug according to an FDA-approved label if that was what was required to avoid state law liability. And as I listened to my friend on the other side's argument this morning, it sure sounds a whole lot like the stop-selling argument that the Supreme Court rejected in Bartlett. There are actually three paths, I think, to affirmance in this case, all of which the district court walked through and each of which my friend on the other side would have to run the table on. Just on this point, isn't there a difference between a situation in which we know FDA stands behind the label because it stands behind the drug, in which case the stop-selling argument fails, and a case in which we know the label, if we even know that much, but we know the label can't be changed, but FDA has made it clear it's not necessarily standing behind the drug? Why would those be identical situations? I think they would be identical situations in that until the FDA withdrawal process runs its course, we do not know what FDA's ultimate conclusion would be. There was a committee. So how does that, for purposes of a possibility preemption, why does that uncertainty favor you? I understand why when we're certain and have no reason to doubt FDA stands behind the label and the drug, a stop-selling argument's a problem. But when there's uncertainty and the standard is impossibility, why does the uncertainty help you? Senator, I don't think there is the uncertainty that Your Honor is in. The degree of uncertainty that you just identified. Right, so there is a committee. We don't know what FDA will do. We don't know what FDA will do, that's right. But we know they're thinking about it. FDA is thinking about lots of things for lots of drugs all of the time. The fact of the matter is that there is actually a property right that a manufacturer has to market its product according to its FDA-approved label unless and until that approval is withdrawn or if the CBE process is available, a manufacturer can be required to utilize it in order to avoid state law liability. Here the CBE process was not available. This is a single indication drug. And do we know that for sure, that that's the right answer? So I think we do know it for sure. I think it requires you to go through a couple of regulatory provisions to see it. But the major change regulation, which is 21 CFR 314.70B, specifically says that it is a major change if you are going to change anything that is the information covered by a different section, 201.57A. And that is where the indications and usage are set out in the label. But they're also set out elsewhere in the label. They are. There's no provision that you can't change them elsewhere. So you've literally got this reg that basically says these two statements, you can't change one here but you can change the same one 10 pages later in the law. Oh, I don't think that's quite right, Your Honor, because you can't change it in either place. The information that's required by 201.57A counts as a major change. 201.57A6 is the provision that specifically covers indications and usage. Didn't your client attempt to change? We did. We attempted to go through this process for a major change. That is exactly right. It is the change that requires FDA approval. So we tried to use the process that was available to us, which is the major change process. But in order to rule for you, we'd have to decide for you on this issue if we did it on the preemption ground. Correct? There are two paths even on preemption grounds. One is that the CBE process was not available. That's right. That's what we're talking about now. But the second ground is that there is clear evidence that FDA would have rejected a change even if it were available. And on either of those, we have to make a ‑‑ and maybe this is just endemic to the way the case law is played out, but it does cause me some concern that I have to be deciding what FDA would do without any input from the FDA on what it actually would do or what it thinks of these questions. Particularly the CBE decision, if we decide it's not available, that's a fairly significant holding, which you would think we might want to hear from the FDA about whether they think that's true before we went ahead and said, no, you're wrong, FDA, it's not available. So, Your Honor, I think that the determination of whether the CBE process is available is the same kind of straightforward interpretation of regulations that this court does day in and day out. We usually do it when the FDA is a party. That's what I'm saying. I'm not questioning that we have to make a judgment. What I'm questioning is we're doing it in a case where the FDA is not here to say what it thinks. Why do we even need to get into this statutory interpretation, regulatory interpretation? Didn't the FDA, in response to a proposed change, categorically simply say, we cannot approve a supplement for labeling revisions to address the findings of the trial? Yes, Your Honor, and that was going to be my second answer to Chief Judge Barron. If you don't want to get into that question about whether the CBA process was or was not available, then the second path is to say there is this sort of clear evidence that this court's case law has recognized. And that's through the CML? What was the document through which that was done? It's the complete response letter, JA301. The complete CRL, I guess. And isn't that there's at least some question whether something not having the full force of law can have preemptive effect? So, Your Honor, I saw that in the other side's brief, and I think that's really very misleading. There was a suggestion by one justice in a concurrence that no one else joined that, in some circumstances, a complete response letter might not have the force and effect of law. That was a circumstance where the very terms of the letter talked about correcting the reason that it was being denied. No other justice joined that part of the decision in Albrecht, and the other justices all found that the complete response letter did have the force and effect of law, and I think that's, as the majority holding, what this court would be well-heeded to follow as well. Do we need something with the force of law? I thought the test here was that there is clear evidence that the FDA would not have allowed it, which sounds more like a factual question. You are correct, Your Honor, that the question is whether there is clear evidence that the FDA would have rejected a change, and that is what the complete response letter, I think, provides here. As Your Honor's question noted, it was a categorical determination that the FDA was not going to tinker with this label because it was, at the recommendation of one of its committees, it was starting down this path of the process that FDA has for withdrawing approval of a drug. At the end of that process, there could be a withdrawal. There could also not be a withdrawal. There was a lot of scientific and statistical analysis going on, in this case in particular, to determine whether there were different risk profiles among the patient populations in these two studies. In all events, and I'm not saying this is a defect in your argument, but it is the case that you're asking us to make a preemption ruling rejecting the no-sale option, even in a case in which there is at least some smoke about whether there might be a withdrawal. That's right. Is there other cases like that? I'm not aware of any other cases. So that would be the new ground we'd be breaking if we went with you. I think it would be incredibly new ground to break to announce that preemption would not apply in a context where a manufacturer has an FDA approval. The FDA approval is what the manufacturer is trying to market its drug for. And FDA's statement here to public citizen, citizen petition, that specifically called out that the approval remained in effect with active marketing status. It's just very difficult to see how anything – If we switched over to the – Judge Linz, did you have any further questions on preemption? Not on preemption, but I wonder if counsel can address the district court's third reason, which is the Rule 9b and whether the requisite requirements for stating fraud have been met here. Absolutely, Your Honor. I'm happy to do that. And the very straightforward answer is no, they have not. Rule 9b required the plan to allege with particularity that either it or its pharmacy benefits administrator, its pharmacy benefits manager, its insurers, their physicians, someone relied on the statements that they allege were misrepresentations. And those allegations are completely missing. I heard a mention in the earlier argument from my friend on the other side about its pharmacy benefit administrator, which is a company called Broadreach, and OptumRx, which was its – who created the formulary for it. Those allegations are paragraphs 72 and 73. There is nothing in those paragraphs that refers to any reliance on any statement at all, let alone something that the plaintiff says is an alleged misstatement. The reply brief has a series of bullet points at pages 21 and 22, and I would encourage the court to look at those paragraphs of the complaint that they cite as where they pled the reliance, because what you will see is that the paragraphs they're citing either have no time period or long predate the time period here. They're talking about in 2011 and 2012, when this drug had first been approved, what were marketing decisions that were made. There is simply no allegation. Wouldn't the mere marketing of the drug be reasonably viewed, or a jury could find it could reasonably be viewed as a representation that the drug is effective? And wouldn't it also follow that the plaintiffs would not have put the drug on their formulary had it not been marketed? So if marketing is sufficient to be an implicit representation, it would have been relied upon in placing the drug on the formulary. Your Honor, this case, I think, is a particularly strong one for requiring the 9B particularity standard to be met as to reliance, and here's why. We have a case where there is no question that this study was publicly announced. The findings were publicly announced in March of 2019. FDA had this very public process and hearing later in 2019. The results were published in a journal. If any of the doctors or patients or the developers of the formulary knew about the study, and yet were still made the determination to keep the drug on the formulary because of its FDA approval or for any other reason, there are breaks in the causal chain that the plaintiff has not shown don't exist. So we don't have a causal chain here. Do they have to know about the study? No. That would be one such thing, though. Suppose they didn't know about the study and they just relied on the statement. So, Your Honor, if there were allegations along those lines, it would get them one step closer, but there is no such allegation. I guess I just didn't follow. Judge Codd, as hypothetical to you was, or not hypothetical, was just the account was, wouldn't it be reasonable to think you're marketing a drug, there's demand for the drug, therefore you put it on the formulary. That's the causal chain that gets to the secondary actor here. Then you said, well, this is an unusual case because of the study, but suppose nobody ever knew about the study. How does that undermine their reliance on the statement? They don't have to rely on the statement. That's right. They don't have to rely on the statement knowing that the statement overcame the study, do they? They have to have alleged that their injury results from someone having relied on these misstatements. And that they proved the statement was misleading by the study. It either is or isn't. But they're just proving their reliance based on relying on the marketing. And that's just the typical case. So the fact that there's a study here doesn't change this from the typical case, unless I'm missing something. I think what you're missing, Your Honor, or maybe what I'm not articulating clearly is probably the more correct way of thinking about it, is that as the district court noted, there are no allegations about what misstatement anyone saw, when they saw it, how it affected their decision making. And so when I was referencing the study, that... But that's what I'm trying to figure out. In a case like this, there's a drug. It's being marketed to lots of people. The formulary responding to that demand puts it, I mean, they put it on the formulary because they're responding to that demand. They could be. They could be putting it on the formulary for any of a number of reasons. Makina was the only approved drug for preterm birth. So in any of these cases, like the cases in which they're relying on where we said it was enough of a proxima causal chain, what is missing here that you would say, okay, well, that would be enough if they had said that? So I think if they had said, our PBM OptumRx received this statement on this date after the study came out. Suppose they hadn't. Suppose what they have is the PBM had lots of people coming to them wanting the drug. And the drug was being widely marketed to the public, saying it was super beneficial. Is that not enough? So, Your Honor, I think this Court's Rule 9B case law and Humana, I think, is a good... But Humana is different because of the context there and the wholesalers and the particular chain of statements that was the source of the fraud. This is a claim. We put it out there because everybody wanted it. Everybody wanted it because you were telling everybody they should want it. What more do you need? So I think Rule 9B really loses its force and effect if you don't have to identify, really, anything more than you would for an Iqbal or a Twombly analysis to just say this drug was marketed and we relied on that. In Bridge, the Supreme Court went out of its way to stress that someone has to have actually relied on a misstatement in order to create causation. And the district court here was exactly correct. You can look at the paragraphs cited at those bullet points in the reply brief, and you will not find any allegation in which the plaintiffs connect the dots between a statement that they say was a misstatement and a decision made by any insured physician, pharmacy benefits manager, or themselves to actually cover this drug. That's what's missing. And that's why Rule 9B is one alternative path to simply affirming the decision below. I'm happy to address the indirect purchaser rule if the court wants, but I also see my time is out, so I will defer to whether you have questions on that. Well, before you're going to have an Illinois BRIC rule, don't you need to have a Hanover rule? And we don't have the problem here that the court confronted in Hanover where it was dealing with an incremental, debatable, marginal increase on price or not. Here you've got more obvious, easily determined pass-through, which could be raised as a defense by the direct purchaser. So I'm having trouble understanding why you would import the indirect purchaser rule here, particularly where the antitrust laws are really sui generis in being essentially a common law regime, and here we have a statutory regime. So, again, you're up. So, yes, there is a lot packed up in that too. I was just going to say that. I think you are correct to start with the fact that Hanover SHU and Illinois BRIC are two sides of the same coin. Essentially, there can be neither offensive nor defensive use of this concept that injury could be passed along a distribution chain. That is why Illinois BRIC is rooted in and is, as I said, the other side of the coin from Hanover SHU. They are both statutory private rights of action that Congress chose to use the same wording in, this by reason of wording, and that by reason of wording that Congress imported into civil RICO from the antitrust laws is what the Supreme Court has said is the basis for both proximate cause and the indirect purchaser rule. Right, but the question is just whether by reason of means the same thing in the context of an antitrust injury as it means in the context of a claim of fraud. That's right, Your Honor, and there are three circuits that have looked at this, and all three of them have said that by incorporating the same... That question, other than just saying the words by reason of are the same, have they explained why it makes sense to say by reason of means the same thing in the context of antitrust injury as it means in the context of fraud? Yes. They have to the extent that they have talked about the... There are, I think, three policy underpinnings that the Supreme Court has highlighted as the basis for the Illinois BRIC rule, most recently in the Apple v. Pepper case, and it has to do with the difficulty in apportioning damages when something is moving along a distribution chain, the possibility of duplicative damages amount. If there is no indirect purchaser rule in civil RICO cases, then the wholesaler can bring a claim, the pharmacy can bring a claim, the insureds can bring a claim, the pharmacy benefit administrator. There can be many claims all seeking the same duplicative damages amount. But it would be very easy in most such cases to determine the pass-through, whereas in Hanover Shoe and Illinois BRIC, the court was rightly confronted with the almost impossibility of determining the pass-through, given the nature of antitrust damages. So, Judge Kayada, there have been any number of people who have thought that determining pass-through has gotten easier in the decades since Hanover Shoe and Illinois BRIC were... Well, I'm not talking about... I'm not saying it got easier on antitrust claims. I'm saying in this sort of claim, you don't have the degree of pass-through complexity that was the key reason why Hanover and Illinois BRIC came to exist. And, Your Honor, I think the answer to that is the Supreme Court's decision in Utilicor, where it said these same policies may not apply with equal force across every industry or across every set of facts. Right, but that's still in the category of antitrust injury. And so the question is whether we're just resting, W-R-E-S-T, a set of policies that were used to describe a rule for treating antitrust injury and then saying, oh, look, those might have some application here, too. And then we say, well, it was overbroad in antitrust, so the fact that it would be overbroad here can't be a problem. So you're, like, doubling down on taking some language that was designed for one problem, now importing it to another problem and saying, yes, it's a poor fit here, but when it was a poor fit there, we didn't mind. Therefore, let's make it a poor fit here, too. I don't know that that's the greatest argument. Well, Your Honor, I think that in Holmes, which is where the Supreme Court ported over the same proximate cause analysis that's rooted in the same by reason of language, the court did so in reliance on the fact that Congress had chosen to use the same language, had chosen to model civil RICO on the antitrust laws. And so what the Supreme Court said in Holmes is that Congress has already told us this is what we should do. We're porting over the applicable antitrust principles. So essentially everything except antitrust injury, which there is no such thing as racketeering injury, but everything else has been ported over. But that would be the one thing that might be specific and not general. That's right, Your Honor. And so I think the answer is if Congress wants a different view, then it is up to Congress to make that happen. So for all of these reasons, we would ask that you choose one of these paths to affirm the decision below. Judge Litz, anything further? No, thank you. Thank you. Thank you, Your Honors. Thank you, counsel. At this time, would counsel for the appellant please reintroduce himself on the record? He has a two-minute rebuttal. Thank you, Your Honor. Joseph Meltzer for the appellant, Cleveland Bakers. Your Honor, the first issue is on the CBE. The opinion itself states that on page 15, it is possible that the CBE process could have been used to add or account for the results of the prolonged study on the McKenna label. The district court then goes on to say it doesn't matter because the FDA essentially rejected that label. But clearly he's on to step two on the clear and convincing evidence front. And, Judge Katya, your question essentially says, well, in the complete response letter, the FDA rejects the change, but, and I would submit, as we said in our papers, the district court reads out the first sentence, which essentially says, CDER has determined that McKenna is not shown to be effective and is proposing to withdraw its approval. Therefore, we cannot approve a supplement for labeling revisions to address the findings of the prolonged study at this time. So, yes, you're right. They did reject the labeling change. The reason for it is set forth right in the complete response letter. It's a prediscovery case. We're on a Rule 12 motion. We don't have any other discovery. I understand that essentially clear and convincing evidence is a question of law for the court. There should be some balancing of all the factual background that the court knows about. I don't think, respectfully, that that was done here. And the issue is, are you going into a new territory? Well, the other cases, this seems very case-by-case, including, as I stated earlier, the Zofran case, the Selexa case, Albrecht, Bartlett that my colleague mentioned. It's fact-specific. So if there is a lot out there where the manufacturer, at least as you said, Judge Barron, there's smoke about whether approval is going to continue, then, you know, the manufacturer can market a drug. But it doesn't mean that it doesn't have to disclose any of the results that it clearly knows about in any of its marketing materials. In doing your fact-intensive approach to leverage the tendency of the approval as distinguishing this from other cases, would we also consider the fact that this is an instance in which there's no conservative safe harbor here? In other words, we have a drug that has no competitors and a condition for which it is the only arguable solution. So you could see where the FDA might have hesitancy to just erroneously conclude it's ineffective. Your Honor, the FDA would not jump to that conclusion for that reason, for due process reasons, because the FDA is often sued when they act too quickly or whenever they act in any event. In other words, my point is there's actually a downside to withdrawing a drug like this from the market as opposed to a case where, for example, it wasn't efficacy but it was safety that was the issue. I suppose this is different than a safety claim. There are a bunch of regulations that the district court even cites in footnote 4 of its opinion regarding the regulations that pertain to safety. There's also regulations that pertain to advertisement and making true statements and not having advertisements for pharmaceuticals that are in any way misleading. As to the safe harbor point, they ultimately did withdraw the approval of this drug. It's just a process that took three years, and as our complaint details, in that time, it's not... And my colleague mentioned the statements from 2011 through 2019. Our case isn't based on those statements. We don't have any evidence that they knew or should have known at the time that those weren't true. But what they've said from March 2019 until the withdrawal of the approval in 2023, that's what's relevant here. So, yeah, the FDA might look a little bit differently, and it's not a stop-selling case. We're not saying stop selling. We're saying don't market the drug unless you... And there's nothing that prevented them. As my colleague mentioned, the prolonged studies are public. It's not they weren't confidential, they weren't subject to any NDA. They could publish those, they could put those out so that patients could consider them. They're charging a lot of money for the drug, and they're also charging payers a lot of money for the drug. And I'll dovetail very quickly into what our complaint says at paragraph 68 to 79, is the way these drugs are positioned for placement on the formulary, it's not an accident. Now, we don't have all the communications because, again, it's pre-discovery, but this scheme, as it did in Kaiser and as it did in the 2019 decision in Celexa, depends on having payers pay for the drug. We are the foreseeable and intended victims of this fraudulent marketing scheme. Thank you. Thank you. Thank you, counsel. That concludes argument in this case.